**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Karly Nelson, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>JOHN PAUL MITCHELL SYSTEMS,<br><br>    Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Karly Nelson ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, brings this class action complaint against Defendant John Paul Mitchell Systems, Inc. ("Defendant" or "Paul Mitchell") and alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

<u>NATURE OF THE ACTION</u>

1.     This is a class action lawsuit regarding Defendant's manufacturing, distribution, advertising, marketing, and sale of Paul Mitchell Invisiblewear Brunette Dry Shampoo (the "Product") that contains dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers.

2.     The presence of benzene in the Product renders it adulterated, misbranded, and illegal to sell under federal and state law.

3.     Prior to placing the Product into the stream of commerce and into the hands of consumers to use on their hair and scalp, Defendant knew or should have known that the Product contained benzene, but Defendant misrepresented, omitted, and concealed this fact to consumers,

including Plaintiff and Class members, by not including benzene on the Product's label or otherwise warning about its presence.

4.      Plaintiff and Class members reasonably relied on Defendant's representations that the Product was safe, unadulterated, and free of any carcinogens that are not listed on the label.

5.      Plaintiff and Class members purchased and used the Product and were therefore exposed to, or risked being exposed to, the harmful presence of benzene in the Products.

6.      The Product is worthless because it contains or risked containing benzene, a known human carcinogen that is an avoidable ingredient in the Product and Defendant's manufacturing process. Indeed, the presence of benzene renders the Product adulterated, misbranded, and illegal to sell.

7.      Defendant is therefore liable to Plaintiff and Class members for selling the Product without disclosing that the Products contain or risk containing benzene.

## PARTIES

### I.  Plaintiff

8.      Plaintiff Karly Nelson is a resident and citizen of Chicago, Illinois. Plaintiff purchased Paul Mitchell Invisiblewear Brunette Dry Shampoo multiple times, but most recently in January of 2022, which she used for about two months. Plaintiff purchased the Product at Walmart stores located in Chicago, Illinois.

9.      When purchasing the Product, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendant that the Product was properly manufactured, free from defects, and safe for its intended use. Plaintiff relied on these representations and warranties when deciding to purchase the Product, and these representations and warranties were part of the basis of the bargain. Had Defendant not made the

false, misleading, and deceptive representations and omissions regarding the Product containing or risking containing benzene, Plaintiff would not have been willing to purchase the Product. The Product Plaintiff purchased was worthless because it either contained or risked containing the known carcinogen benzene. Accordingly, Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

## II. Defendant

10.     Defendant John Paul Mitchell Systems is a corporation organized, existing, and doing business under and by virtue of the laws of the state of California with its principal place of business located at 20705 Centre Point Parkway in Santa Clarita, California. Defendant its Paul Mitchell-branded haircare products, including the Invisiblewear Brunette Dry Shampoo, throughout the United States. The Product, including that purchased by Plaintiff and Class members, is available at various retail stores and professional hair salons throughout the United States. Defendant authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of the Product.

## JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendant, and (4) there are more than 100 Class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

12.     This Court has personal jurisdiction over Defendant because the claims asserted in this complaint arise out of Defendant's contacts with this district. Defendant has been afforded due

process because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a business venture in this state, and/or marketed, advertised, distributed and/or sold products, committed a statutory violation within this state related to the allegations made herein, and caused injuries to Plaintiff and putative Class Members, which arose out of the acts and omissions that occurred in the state of California, during the relevant time period, at which time Defendant was engaged in business activities in the state of Illinois.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this complaint occurred in this state. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendant conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, and marketing of the Product in this District.

## FACTUAL ALLEGATIONS

### I. Defendant's History in the Industry

14.     Paul Mitchell was established in 1980 with the purported mission of providing luxury hair care at an affordable price. The company began by selling three hair care products; as of 2018 its line had expanded to more than 80 products, including the Product at issue here.[1]

---

[1] https://money.cnn.com/2018/04/09/news/companies/john-paul-dejoria-rebound/index.html (Last Accessed November 4, 2022)

15.     The global haircare market was worth $85.5 billion dollars in 2017 and is expected to exceed $102 billion dollars by 2024.[2] Paul Mitchell's annual sales are estimated at $510 million.[3]

16.     Defendant's products, including the Invisiblewear Brunette Dry Shampoo, are manufactured, distributed, and sold throughout the United States, including the State of Illinois.

17.     Defendant has gained the trust of consumers, who believe Defendant's promises to use "high-quality ingredients" in its products.[4]

18.     In fact, Defendant pledges "Quality Assurance" to its customers. To that end, Defendant actively fights "diversion," i.e., the sale of its products by unauthorized retailers. Defendant cautions consumers that by purchasing from its website, a salon, or authorized online retailers Ulta, JC Penney, and Amazon, the products are guaranteed not to be "tampered with."[5]

19.     The Product at issue is a dry shampoo, which is a product designed to absorb the dirt, oil, and grease of the scalp without washing it.[6]

---

[2] https://www.statista.com/topics/4552/hair-care-product-market-in-the-us/ (Last Accessed November 4, 2022)
[3] https://www.happi.com/contents/view_top-companies-report/2020-07-01/27-john-paul-mitchell-systems-816580/ (Last Accessed November 4, 2022)
[4] https://www.paulmitchell.com/company/our-product (Last Accessed November 4, 2022)
[5] *Id*.
[6] https://www.webmd.com/beauty/what-is-dry-shampoo (Last Accessed November 3, 2022)



20.     Dry shampoos are typically administered from an aerosol can and made with a base of alcohol or starch.  When applied to the hair, the dry shampoo soaks up the oil and grease, making it look cleaner.

21.     The U.S. Food and Drug Administration ("FDA") classifies and regulates shampoos, including dry shampoos like the Products, as cosmetics.

## II.  Benzene Is a Known Human Carcinogen

22.     The World Health Organization and the International Agency for Research on Cancer have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[7]

23.     The Department of Health and Human Services has determined that benzene causes cancer in humans.[8]

24.     "IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma."[9]

25.     Benzene exposure has been linked with acute lymphocytic leukemia, chronic lymphocytic leukemia, multiple myeloma, and non-Hodgkin lymphoma.[10]

26.     The NIOSH and CDC identify "target organs" associated with human exposure to benzene to include: "eyes, skin, respiratory system, blood, central nervous system, bone marrow.[11]

27.     The CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells."[12]

---

[7] *IARC Monographs on the Identification of Carcinogenic Hazards to Humans: List of Classifications*, WHO, https://monographs.iarc.who.int/list-of-classifications (last updated July 1, 2022).
[8] *Facts About Benzene*, CDC (last updated Apr. 4, 2018) https://emergency.cdc.gov/agent/benzene/basics/facts.asp.
[9] *Benzene and Cancer Risk*, American Cancer Society (last updated Jan. 5, 2016) https://www.cancer.org/cancer/cancer-causes/benzene.html.
[10] *Id.*
[11] *NIOSH Pocket Guide to Chemical Hazards: Benzene*, CDC, https://www.cdc.gov/niosh/npg/npgd0049.html (last updated Oct. 30, 2019).
[12] *Facts About Benzene*, *supra*.

### III. Benzene Is Primarily Used in Industrial Processes and Is Highly Regulated

28.     The CDC states that "[s]ome industries use benzene to make other chemicals that are used to make plastics, resins, and nylon and synthetic fibers. Benzene is also used to make some types of lubricants, rubbers, dyes, detergents, drugs, and pesticides."[13]

29.     Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.[14]

30.     The FDA currently recognizes the danger of benzene and, as a result, has claimed it should not be used in the manufacture of any component of a drug product due to its unacceptable toxicity effect.[15]

31.     Where the use of benzene or other Class 1 solvents is unavoidable, the FDA has stated that the levels should be restricted, and benzene is restricted under such guidance to 2 parts per million ("ppm").[16]

### IV. Exposure to Benzene in any Amount Is Extremely Dangerous

32.     A 1939 study on benzene stated that "exposure over a long period of time to any concentration of benzene greater than zero is not safe."[17]

---

[13] Id.

[14] Benzene, National Cancer Institute, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene (last updated Jan. 14, 2019).

[15] David Light et al., Valisure Citizen Petition on Benzene in Dry Shampoo Products (October 31, 2022), https://assets-global.website-files.com/6215052733f8bb8fea016220/6360f7f49903987d8f4f4309_Valisure%20FDA%20Citizen%20Petition%20on%20Benzene%20in%20Dry%20Shampoo%20Products_103122.pdf (the "Valisure Citizen Petition").

[16] Id.

[17] F.T. Hunter, Chronic Exposure to Benzene (Benzol): The Clinical Effects, 21 J. Indus. Hygiene & Toxicology 331 (1939), https://www.cabdirect.org/cabdirect/abstract/19402700388.

33. A 2010 study summarized the epidemiological studies of the carcinogenic effects of benzene exposure and provided an overview of the hematotoxic effects of benzene.[18] The study concluded:

    a. There is probably *no safe level* of exposure to benzene, and *all exposures* constitute some risk in a linear, if not supralinear, and additive fashion.

    b. Exposure to benzene can lead to multiple alterations that contribute to the leukemogenic process, indicating a multimodal mechanism of action.

    c. Benzene is a ubiquitous chemical in our environment that causes acute leukemia and probably other hematological cancers.

34. The CDC has stated that ways in which people "could be exposed to benzene" include[19]:

    a. Outdoor air contains low levels of benzene from tobacco smoke, gas stations, motor vehicle exhaust, and industrial emissions.

    b. Indoor air generally contains levels of benzene higher than those in outdoor air. The benzene in indoor air comes from products that contain benzene such as glues, paints, furniture wax, and detergents.

    c. The air around hazardous waste sites or gas stations can contain higher levels of benzene than in other areas.

    d. Benzene leaks from underground storage tanks or from hazardous waste sites containing benzene can contaminate well water.

---

[18] Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 ANN. REV. PUB. HEALTH 133 (2010), https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.

[19] *Facts About Benzene*, *supra*.

  e. People working in industries that make or use benzene may be exposed to the highest levels of it.

  f. A major source of benzene exposure is tobacco smoke.

35. The NIOSH and CDC identify "exposure routes" for benzene to include: "inhalation, skin absorption, ingestion, skin and/or eye contact."[20]

36. "Direct exposure [to benzene] of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[21]

37. Skin absorption is particularly concerning as there have been multiple FDA studies showing that structurally similar chemicals in sunscreen products are found in the blood at high levels after application to exposed skin.

38. Benzene exposure from dry shampoo is especially troubling because the Product is applied to the scalp and around the face, with the remnants flying through the air likely to be at least partially inhaled by the user and absorbed into their lungs. Thus, even a relatively low concentration limit can result in very high total benzene exposure.

39. The FDA allows for up to 2 parts per million of benzene in products where the use of benzene is "unavoidable" to produce a drug product with a significant therapeutic advance. However, dry shampoos is not a drug and contains no active pharmaceutical ingredient for therapeutic purpose; therefore, any significant detection of benzene in the Product could be deemed unacceptable.[22]

---

[20] *NIOSH Pocket Guide*, *supra*.
[21] *Facts About Benzene*, *supra*.
[22] *See Valisure Citizen Petition, supra*.

10

## V. Discovery of Benzene in the Products

40. Due to the substantial harm to humans caused by exposure to chemicals such as benzene, companies have been founded with the specific goal of preventing defective products containing said harmful chemicals from reaching consumers. Valisure, an "independent laboratory"[23], is a company with a core mission "to help ensure the safety, quality and consistency of medications and supplements in the market."[24]

41. In terms of accreditation and registration, "Valisure operates an analytical laboratory that is accredited under International Organization for Standardization ('ISO/IEC') 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238),"[25] and it is registered with the Drug Enforcement Administration (License # RV0484814) and FDA (FEI #: 3012063246)."[26]

42. Valisure has tested for specific chemical qualities in numerous types of products, such as N-Nitrosodimethylamine in ranitidine and metformin and benzene in hand sanitizers and sun care products. Each time, Valisure's detection of benzene and other carcinogens has been independently confirmed by the industry and led to recalls by manufacturers over the subject products.

43. On October 31, 2022, Valisure reported its testing results for benzene in various types of dry shampoo utilizing gas chromatography and detection by mass spectrometry ("GC-MS") instrumentation that allows mass spectral separation.[27]

---

[23] "About Us." https://www.valisure.com/about (last visited November 4, 2022).
[24] *Valisure Citizen Petition*, *supra*.
[25] *Id.*
[26] *Id.*
[27] *Id.*

44.    GC-MS "is generally considered one of the most accurate analyses available."[28] Indeed, the FDA used the same method to test for impurities like benzene in hand sanitizers.[29]

45.    "The GC-MS method described in this petition utilized body temperature (37°C) for oven incubation. 40°C has been previously used for benzene analysis from liquid pharmaceuticals and beverages, and reduced false positive results compared with higher-temperature incubation."[30]

46.    Valisure analyzed 148 unique batches from 34 brands of dry shampoo.[31]

47.    Valisure identified ten brands of dry shampoo which contained levels of benzene at 2 ppm or higher, including the Product at issue in this case.[32]

48.    Valisure's testing results were confirmed by the voluntary recalls of several dry shampoo products manufactured by Procter & Gamble and Unilever which were found to contain benzene.[33]

49.    Valisure specifically measured benzene concentrations from 0.97 to 5.21 ppm in the Product:[34]

---

[28] *GC/MS Analysis*, Element, https://www.element.com/materials-testing-services/chemical-analysis-labs/gcms-analysis-laboratories (last visited July 20, 2022).
[29] *Direct Injection Gas Chromatography Mass Spectrometry (GC-MS) Method for the Detection of Listed Impurities in Hand Sanitizers*, FDA (Aug. 24, 2020), https://www.fda.gov/media/141501/download.
[30] *Valisure Citizen Petition, supra.*
[31] *Id.*
[32] *Id.*
[33] https://www.cnn.com/2022/10/24/business/unilever-shampoo-recall (Last Accessed November 4, 2022)
[34] *Valisure Citizen Petition, supra.*

| Brand | UPC | Lot | Description | Benzene Concentration (ppm) |
|---|---|---|---|---|
| Paul Mitchell | 009531127866 | 20274 | Invisiblewear Brunette Dry Shampoo (4.7 oz.) | 35.2 |
| Paul Mitchell | 009531127866 | 19309 | Invisiblewear Brunette Dry Shampoo (4.7 oz.) | 2.88 |
| Paul Mitchell | 009531127866 | 19007 | Invisiblewear Brunette Dry Shampoo (4.7 oz.) | 2.15 |

50.    In most of the lots tested, the detected levels of benzene in the Product are greater than the 2 ppm concentration limit for "unavoidable" uses per FDA guidance.[35]  However, because benzene is not a requisite component of manufacturing or packaging body sprays, its presence in the Product is not unavoidable and "any significant detection of benzene should be deemed unacceptable."[36]

51.    David Light, Founder and Chief Executive Officer of Valisure, stated that "[t]he presence of this known human carcinogen in dry shampoo products that are regularly used indoors and in large volumes makes this finding especially troubling."[37]

---

[35] *Id.*
[36] *Id.*
[37] *Id.*

13

52.     The Product is not designed to contain benzene, and no amount of benzene is acceptable in dry shampoo such as the Product manufactured, distributed, and sold by Defendant. Further, although Defendant lists the ingredients on the Product's labels, Defendant failed to disclose on the Product's labeling or anywhere in Defendant's marketing that the Product contains benzene.

53.     Despite its knowledge that the Product contains benzene, Defendant has failed to issue a voluntary recall of the Product. Until recently, Defendant sold the Product on its website (www.paulmitchell.com).[38] Currently, the Product is no longer listed for sale. However, these actions are inadequate as the Product is still available for sale at Defendant's authorized online retailers.[39]

## VI. Benzene Renders the Product Adulterated, Misbranded, and Illegal to Sell

54.     "Dry shampoo products are considered cosmetics that are regulated by the U.S. Food and Drug Administration."[40]

55.     The FDA has several safety and effectiveness regulations in place that govern the manufacture and marketing of cosmetic products.[41]

56.     As cosmetic products regulated by the FDA, the Product is prohibited from being adulterated or misbranded. *See* FD&C Act, 21 U.S.C. §§ 361, 362.

57.     A cosmetic is deemed "adulterated" if it "bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed

---

[38] Archived images of the Product website indicate as of May 25, 2022, the Product was still being sold on the website. *See* https://web.archive.org/web/20220525092211/https://www.paulmitchell.com/paul-mitchell/invisiblewear/invisiblewear-dry-shampoo (Last Accessed November 4, 2022)

[39] *See, e.g.,* https://a.co/d/aXfczwR (Last Accessed November 4, 2022)

[40] *Valisure Citizen Petition*, *supra*.

[41] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, FDA, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated (last updated Mar. 2, 2022).

in the labeling thereof, or under such conditions of use as are customary or usual..." 21 U.S.C. § 361(a).

58.     A cosmetic shall be deemed to be misbranded if its labeling is false or misleading in any particular. 21 U.S.C. § 362 (a).

59.     FDA guidance permits up to 2 ppm benzene in a product if its use in the manufacturing process is "unavoidable."[42]

60.     In cosmetic products, the FDA has announced recalls of various products contaminated with benzene, including other dry shampoos[43].

61.     Moreover, because dry shampoos are cosmetics and not drugs, they contain no active pharmaceutical ingredient for therapeutic purpose which might create an exception to the presence of benzene.

62.     Regardless, Defendant's Product contains levels of benzene above 2 ppm, including, in some cases, **more than 17 times** that limit.[44]

63.     Defendant could have avoided any potential for benzene contamination in the Product by changing the manufacturing process or raw ingredients, and the Product could have been sold with absolutely no benzene in them.

64.     The mere presence of benzene renders the Products both adulterated and misbranded under the FDCA. The Product is adulterated because they "contains [a] poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof." 21 U.S.C. § 361(a).

---

[42] *Valisure Citizen Petition*, *supra*.
[43] Food and Drug Administration. *P&G Issues Voluntary Recall of Aerosol Dry Conditioner Spray Products and Aerosol Dry Shampoo Spray Products* (December 17, 2021) (https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/pg-issues-voluntary-recall-aerosol-dry-conditioner-spray-products-and-aerosol-dry-shampoo-spray)
[44] *Valisure Citizen Petition*, *supra*.

65. The Product is misbranded because its labeling is "false" and "misleading" because it does not disclose the presence of benzene. 21 U.S.C. § 362(a).

66. A product that is "adulterated" or "misbranded" cannot legally be manufactured, advertised, distributed, or sold. 21 U.S.C. § 331(a). Adulterated and misbranded products thus have no economic value and are legally worthless.

67. The Illinois Food, Drug and Cosmetic Act ("IL FDCA") has expressly adopted the federal labeling requirements as its own. The definition of "adulterated" as defined by 410 ILCS 620/14 is exactly the same as the FD&C Act.

68. As alleged herein, Defendant has violated the FDCA, the IL FDCA, the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), and various state consumer protection statutes. Defendant engaged in fraudulent, unfair, deceptive, misleading, and/or unlawful conduct stemming from its misrepresentations and omissions surrounding benzene contamination affecting the Product.

69. If Defendant had disclosed to Plaintiff and putative Class Members that the Product contained or risked containing benzene and thus risked users to benzene exposure, Plaintiff and putative Class Members would not have purchased the Product or they would have paid less for the Product.

70. As a seller of a cosmetic, Defendant had and has a duty to ensure that its Product did not and do not contain excessive (or any) level of benzene, including through regular testing, especially before injecting the Product into the stream of commerce for consumers to use on their hair and scalp. But based on Valisure's testing results set forth above, Defendant made no reasonable effort to test its Product for benzene. Nor did it disclose to Plaintiff in any advertising or marketing that its dry shampoo contained benzene, let alone at levels that are many multiples

of the emergency, interim limit set by the FDA. To the contrary, Defendant represented and warranted, expressly and impliedly, that the Product was of merchantable quality, complied with federal and state law, and did not contain carcinogens or other impurities such as benzene.

## VII.  Defendant's Knowledge, Misrepresentations, Omissions, and Concealment of Material Facts Deceived Plaintiff and Reasonable Consumers

71.     The Product contains isobutane and propane as a propellant.

72.     Aerosols typically contain volatile hydrocarbons, like butane or isobutane, as propellants. These propellants are derived from crude oil and manufactured in oil refineries where a variety of other hydrocarbons, including benzene, are produced.

73.     Because the chemicals are derived from the same sources in the same facilities, there is high potential for benzene contamination in the processing of isobutane.

74.     Manufacturing companies that work with isobutane understand the risks of benzene contamination.[45]

75.     Defendant, a large, sophisticated corporation in the business of manufacturing, distributing, and selling products containing aerosol propellants such as isobutane, knew or should have known of the risks of benzene contamination.

76.     Defendant's use of isobutane as a propellant therefore put them on notice of the risk of benzene contamination in the Products.

77.     Defendant sold, and continue to sell, dry shampoo products containing isobutane during the class period despite Defendant's knowledge of the risk of benzene contamination.

---

[45] *See, e.g.*, *Butane Safety Data Sheet*, Whiting, https://whiting.com/wp-content/uploads/Butane-SDS.pdf (last updated Oct. 30, 2013) ("MAY CONTAIN TRACE AMOUNTS OF BENZENE WHICH CAN CAUSE CANCER OR BE TOXIC TO BLOOD-FORMING ORGANS.").

78.     Federal and state regulatory regimes require that cosmetics marketed on a retail basis to consumers contain a list of ingredients.[46] Failure to comply with this requirement renders a cosmetic misbranded under the FD&C Act.

79.     Benzene is not listed on the Product's label as an ingredient, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Product.

80.     Defendant has engaged in deceptive, untrue, and misleading advertising by making representations by failing to warn about the potential presence of benzene in the Product, and nothing on the Product's labels otherwise insinuate, state, or warn that the Product contains benzene.

81.     The presence of benzene in the Product renders the Product misbranded and adulterated and therefore illegal and unfit for sale in trade or commerce. Plaintiff would not have purchased the Product had they been truthfully and accurately labeled.

82.     Had Defendant adequately tested its Product for benzene and other carcinogens and impurities, it would have discovered that its Product contained benzene – even at levels above the FDA's limit (to the extent even applicable), making the Product illegal to distribute, market, and sell.

83.     Defendant also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans."[47]

---

[46] *See* 21 C.F.R. § 701.3
[47] https://monographs.iarc.who.int/list-of-classifications (last visited Aug. 18, 2022).

84.     Accordingly, Defendant knowingly, recklessly, or at least negligently, introduced a contaminated, adulterated, and misbranded Product containing or risked containing dangerous amounts of benzene into the U.S. market.

85.     By marketing and selling its body spray products in the stream of commerce with the intent that its Product would be purchased by Plaintiff and Class Members, Defendant warrants that the Product is safe to use rather than adulterated body sprays containing a dangerous, cancer-causing chemical.

86.     Defendant did not disclose the actual or potential presence of benzene in its dry shampoo products on the Product's labeling, advertising, marketing, or sale of the Product.

87.     Defendant's concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies. Consumers such as Plaintiff and Class members make purchasing decisions based on the representations made on the Product's labeling, including the ingredients listed.

88.     Defendant knows that if it had not omitted that the Product contained benzene, then Plaintiff and Class members would not have purchased the Product.

## VIII.   Injuries to Plaintiff and Class Members

89.     When Plaintiff purchased Defendant's Product, Plaintiff did not know, and had no reason to know, that Defendant's Product contained or risked containing the harmful carcinogen benzene. Not only would Plaintiff not have purchased Defendant's Products had they known the Product contained benzene, but they would also not have been capable of purchasing them if Defendant had done as the law required and tested the Product for benzene and other carcinogens and impurities.

90.    Consumers lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must and rely on Defendant to truthfully and honestly report what the Product contains on the Product's packaging or labels.

91.    Further, given Paul Mitchell's position as a leader in the hair care industry, Plaintiff and reasonable consumers trusted and relied on Defendant's representations and omissions regarding the presence of benzene in the Product.

92.    Yet, when consumers look at the Product's packaging, there is no mention of benzene. It is not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Product. This leads reasonable consumers to believe the Product does not contain benzene. Indeed, these expectations are reasonable because if the Products are manufactured properly, benzene will not be present in the Product.

93.    No reasonable consumer would have paid any amount for products containing benzene, a known carcinogen and reproductive toxin, much less above the limits set by the FDA (which do not even apply to Defendant's Product).

94.    Thus, if Plaintiff and Class members had been informed that Defendant's Product contained or may contain benzene, they would not have purchased or used the Product, or would have paid significantly less for the Product, making such omitted facts material to them.

95.    Defendant's false, misleading, omissions, and deceptive misrepresentations regarding the presence of benzene in the Product are likely to continue to deceive and mislead reasonable consumers and the public, as it has already deceived and misled Plaintiff and the Class Members.

96.     Plaintiff and Class members bargained for a dry shampoo product free of contaminants and dangerous substances. Plaintiff and Class members were injured by the full purchase price of the Product because the Product is worthless, as it is adulterated and contains harmful levels of benzene—or at risk of containing the same—and Defendant failed to warn consumers of this fact. Such illegally sold products are worthless and have no value.

97.     As alleged above, Plaintiff and Class members' Products either contained benzene or were at significant risk of containing the same.

98.     Plaintiff and Class members are further entitled to statutory and punitive damages, attorneys' fees and costs, and any further relief this Court deems just and proper.

## **CLASS ALLEGATIONS**

99.     Plaintiff, individually and on behalf of all others, bring this class action pursuant to Fed. R. Civ. P. 23.

100.    Plaintiff seeks to represent a class defined as:

> All persons who purchased the Product in the United States for personal or household use within any applicable limitations period ("Nationwide Class").

101.    Plaintiff also seeks to represent a subclass defined as:

> All persons who purchased the Product in Illinois for personal or household use within any applicable limitations period ("Illinois Subclass").

102.    Plaintiff also seeks to represent a subclass defined as:

> All persons who purchased one or more of Defendant's Products in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, or Washington for personal or household use within any applicable limitations period ("Consumer Fraud Multi-State Subclass").[48]

---

[48] While discovery may alter the following, the states in the Consumer Fraud Multi-State Class are limited to those states with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, *et*

103.    Excluded from the Class and Subclasses are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entities in which Defendant or its parents and any entities in which Defendant has a controlling interest and its current or former employees, officers, and directors; and (3) individuals who allege personal bodily injury resulting from the use of the Products.

104.    Plaintiff reserves the right to modify, change, or expand the definitions of the Class based upon discovery and further investigation.

105.    *Numerosity*: The Class is so numerous that joinder of all members is impracticable. The Class likely contains thousands of members based on publicly available data. The Class is ascertainable by records in Defendant's possession.

106.    *Commonality*: Questions of law or fact common to the Class include, without limitation:

    a.  Whether the Product contains benzene;

    b.  Whether a reasonable consumer would consider the presence of benzene in the Product to be material;

    c.  Whether Defendant knew or should have known that the Product contains benzene;

    d.  Whether Defendant misrepresented whether the Product contains benzene;

    e.  Whether Defendant failed to disclose that the Product contains benzene;

    f.  Whether Defendant concealed that the Product contains benzene;

---

*seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349 and 350); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*).

g.  Whether Defendant engaged in unfair or deceptive trade practices;

h.  Whether Defendant violated the state consumer protection statutes alleged herein;

i.  Whether Defendant was unjustly enriched; and

j.  Whether Plaintiff and Class members are entitled to damages.

107.  *Typicality*: Plaintiff's claims are typical of the claims of Class members. Plaintiff and Class members were injured and suffered damages in substantially the same manner, have the same claims against Defendant relating to the same course of conduct, and are entitled to relief under the same legal theories.

108.  *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class and have no interests antagonistic to those of the Class. Plaintiff has retained counsel experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case. Counsel intends to vigorously prosecute this action.

109.  *Predominance and superiority*: Questions of law or fact common to Class members predominate over any questions affecting individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class members is impracticable and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. Plaintiff is unaware of any difficulties that are likely

to be encountered in the management of this action that would preclude its maintenance as a class action.

110. Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF STATE CONSUMER FRAUD ACTS
**(On behalf of Plaintiff and the Consumer Fraud Multi-State Subclass)**

111. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

112. Plaintiff brings this Count on behalf of herself and the Consumer Fraud Multi-State Subclass against Defendant.

113. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Subclass prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

114. Plaintiff and the other Members of the Consumer Fraud Multi-State Subclass have standing to pursue a cause of action for violation of the Consumer Fraud Acts of the states in the Consumer Fraud Multi-State Subclass because Plaintiff and Members of the Consumer Fraud Multi-State Subclass have suffered an injury in fact and lost money as a result of Defendant's actions set forth herein.

115. Defendant engaged in unfair and/or deceptive conduct by making material misrepresentations and omissions regarding the presence of benzene in the Product, as discussed herein.

116.     Defendant intended that Plaintiff and each of the other Members of the Consumer Fraud Multi-State Subclass would rely upon its unfair and deceptive conduct and a reasonable person would in fact be misled by this deceptive conduct described above.

117.     Given Defendant's position in the hair care market as an industry leader, Plaintiff and reasonable consumers, trusted and relied on Defendant's representations and omissions regarding the presence of benzene in the Product.

118.     As a result of Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other Members of the Consumer Fraud Multi-State Subclass have sustained damages in an amount to be proven at trial.

119.     In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

**COUNT II**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND**
**DECEPTIVE TRADE PRACTICES ACT**
**815 ILCS 505/1, *et seq.***
**(On behalf of Plaintiff and the Illinois Subclass)**

120.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

121.     Plaintiff brings this Count on behalf of herself and the Illinois Subclass against Defendant.

122.     Plaintiff and other Class Members are persons within the context of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1(c).

123.     Defendant is a person within the context of the ICFA, 815 ILCS 505/1(c).

124.     At all times relevant hereto, Defendant was engaged in trade or commerce as defined under the ICFA, 815 ILCS 505/1(f).

125. Plaintiff and the proposed Class are "consumers" who purchased the Product for personal, family or household use within the meaning of the ICFA, 815 ILCS 505/1(e).

126. The ICFA does not apply to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer of this State or the United States." 815 ILCS 505/10b(1).

127. The FDCA prohibits introduction into interstate commerce "of any food, drug, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a).

128. As the Products are adulterated and misbranded, the FDCA specifically prohibits their introduction into interstate commerce, and thus, actions under the ICFA related to the Products being adulterated and misbranded are not barred by 815 ILCS 505/10b(1).

129. The ICFA prohibits engaging in any "unfair or deceptive acts or practices … in the conduct of any trade or commerce…." ICFA, 815 ILCS 505/2.

130. The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA"). 815 ILCS § 505/2.

131. Plaintiff and the other Illinois Subclass Members reasonably relied upon Defendant's representation that the Product was safe for personal use and, due to Defendant's omission of the presence of benzene in the Product, Plaintiff read and relied on Defendant's labeling to conclude that the Product was not contaminated with any dangerous substance, including benzene.

132. Defendant's conduct, as described herein, took place within the State of Illinois and constitutes unfair or deceptive acts or practices in the course of trade and commerce, in violation of 815 ICFA 505/1, *et seq.*

133. Defendant violated the ICFA by representing that the Products have characteristics or benefits that they do not have. 815 ILCS § 505/2; 815 ILCS § 510/2(7).

134. Defendant advertised the Product with intent not to sell them as advertised, in violation of 815 ILCS § 505/2 and 815 ILCS § 510/2(9).

135. Defendant engaged in fraudulent and/or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of 815 ILCS § 505/2; 815 ILCS § 510/2(3).

136. Prior to placing the Product into the stream of commerce and into the hands of consumers to use on their bodies, Defendant knew or should have known that the Product contained benzene, but Defendant not only failed to properly test and quality-check its Product, but further misrepresented, omitted, and concealed this fact to consumers, including Plaintiff and Class members, by not including benzene or the risk of benzene contamination on the Product's labels or otherwise warning about its presence.

137. Defendant intended that Plaintiff and each of the other Illinois Subclass Members would reasonably rely upon the misrepresentations, misleading characterizations, warranties and material omissions concerning the true nature of the Product.

138. Given Defendant's position in the hair care market as an industry leader, Plaintiff and reasonable consumers, trusted and relied on Defendant's representations and omissions regarding the presence of benzene in the Product.

139. Defendant's misrepresentations, concealment, omissions and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and each of the other Illinois Subclass Members to be deceived about the true nature of the Product.

140. Plaintiff and Class Members have been damaged as a proximate result of Defendant's violations of the ICFA and have suffered damages as a direct and proximate result of purchasing the Product.

141. As a direct and proximate result of Defendant's violations of the ICFA, as set forth above, Plaintiff and the Illinois Subclass Members have suffered ascertainable losses of money caused by Defendant's misrepresentations and material omissions regarding the presence of benzene in the Product.

142. Had they been aware of the true nature of the Product, Plaintiff and Class Members either would have paid less for the Product or would not have purchased them at all.

143. On November 14, 2022, Plaintiff provided written notice to Defendant of its violations of the ICFA described herein, but Defendant did not remedy its breaches.

144. Based on Defendant's unfair and/or deceptive acts or practices, Plaintiff and the Illinois Subclass Members are therefore entitled to relief, including restitution, actual damages, treble damages, punitive damages, costs and attorney's fees, under 815 ILCS 505/10a.

**COUNT III**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Nationwide Class)**

145. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

146. Plaintiff brings this Count on behalf of herself and the Nationwide Class against Defendant.

147.     This claim is brought under the laws of the State of Illinois.

148.     Defendant's conduct violated, *inter alia*, state and federal law by manufacturing, advertising, marketing, and selling the Products while misrepresenting and omitting material facts.

149.     Defendant's unlawful conduct allowed Defendant to knowingly realize substantial revenues from selling the Product at the expense of, and to the detriment or impoverishment of, Plaintiff and Class members and to Defendant's benefit and enrichment. Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

150.     Plaintiff and Class members conferred significant financial benefits and paid substantial compensation to Defendant for the Product, which was not as Defendant represented them to be.

151.     Defendant knowingly received and enjoyed the benefits conferred on it by Plaintiff and Class members.

152.     It is inequitable for Defendant to retain the benefits conferred by Plaintiff and Class members' overpayments.

153.     Plaintiff and Class members seek establishment of a constructive trust from which Plaintiff and Class members may seek restitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, pray for relief and judgment against Defendant as follows:

a.     Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representatives of the Class and Subclasses, and designating Plaintiff's counsel as Class Counsel;

b. Awarding Plaintiff and Class members compensatory damages, in an amount to be determined at trial;

c. Awarding Plaintiff and Class members appropriate relief, including but not limited to actual damages;

d. For restitution and disgorgement of profits;

e. Awarding Plaintiff and Class members reasonable attorneys' fees and costs as allowable by law;

f. Awarding pre-judgment and post-judgment interest;

g. For punitive damages; and

h. Granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all claims so triable.

Dated: November 14, 2022                    Respectfully submitted,

*/s/ Gary Klinger*
Gary Klinger
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Ste. 2100
Chicago, IL 60606
Tel: 866-252-0878
gklinger@milberg.com

Nick Suciu III
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel.:(313) 303-3472
Fax:(865) 522-0049
nsuciu@milberg.com

Erin J. Ruben
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
900 W. Morgan St.
Raleigh, NC 27605
Tel: (919) 600-5009
eruben@milberg.com

*Attorneys for Plaintiff*